UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ESTATE OF DERRICK AUSTIN, *et al.*,

Plaintiffs,

v.

KERN COUNTY SHERIFF'S OFFICE, *et al.*,

Defendants.

Case No. 1:24-cv-00647-CDB

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS

(Docs. 65, 70, 71)

Pending before the Court[1] is the motion of Defendants Kern County Hospital Authority ("KCHA"), Vivian De La Cruz, Ella Flaminiano, Mona De Guzman, and Jei Li-Shapiro (collectively, the "Hospital Defendants") to dismiss all claims against them asserted in the operative, second amended complaint.  (Doc. 65.)  On June 10, 2025, Plaintiffs Estate of Derrick Austin, James Ledford, and Lillie Wolfe ("Plaintiffs") filed an opposition to the motion to dismiss, and on June 18, 2025, Hospital Defendants filed a reply.  (Docs. 70, 71.)

I.   **Background**

   A.   **Procedural History**

   On May 31, 2024, Plaintiffs initiated this action with the filing of a complaint against the Kern County Sheriff's Office ("KCSO"), the County of Kern, Sheriff Donny Youngblood, the

---

[1] Following all parties' expression of consent to the jurisdiction of a magistrate judge for all further proceedings in this action, including trial and entry of judgment, on April 17, 2025, this action was reassigned to the undersigned pursuant to 28 U.S.C. § 636(c)(1).  (Doc. 53.)

1    KCHA, and ten unnamed Doe defendants.  (Doc. 1).  On August 8, 2024, Plaintiffs filed their first

2    amended complaint.  (Doc. 7).  On November 21, 2024, the Court issued its order scheduling all

3    case management dates.  (Doc. 34).

4         On April 16, 2025, the parties filed a stipulated request for leave by Plaintiffs to file a second

5    amended complaint that chiefly sought to add 11 individually named defendants.  (Doc. 51).  On

6    April 17, 2025, the Court granted Plaintiffs leave to file a second amended complaint.  (Doc. 54).

7    Plaintiffs filed the operative, second amended complaint ("SAC") on April 21, 2025.  (Doc. 55).

8    On May 21, 2025, the County Defendants filed an answer (Doc. 64) and, on May 27, 2025, the

9    Hospital Defendants filed their pending motion to dismiss (Doc. 65).

10        **B.**    **Factual Allegations in the Second Amended Complaint**

11         In the SAC, Plaintiffs allege that, on March 2, 2023, Derrick Austin ("Decedent") was

12    arrested.  (Doc. 55 ¶ 42).  On March 3, 2023, he was "transferred to the Lerdo Pre-Trial Facility

13    following his initial booking into the Central Receiving Facility."  *Id.* ¶ 43.  On March 4, 2023,

14    after Decedent was found "wrapping a linen around his neck," he was "placed on suicide watch"

15    by Defendant Ella Flaminiano, a nurse, who "submitted a referral to Correctional Behavioral Health

16    for further evaluation and treatment."  Decedent was then transferred to the Lerdo Justice Facility.

17    *Id.* ¶ 44.

18        Plaintiffs alleged that "correctional medical staff were aware that [Decedent] suffered from

19    a number of mental health conditions and disabilities" and "had a history of treatment with multiple

20    psychiatric medications," including by virtue of his prior terms of custody within County of Kern

21    facilities.  *Id.* ¶¶ 41, 45.  On March 7, 2023, Decedent was "placed in a safety cell" after "custody

22    staff observed [Decedent] engaging in self-harming behavior by repeatedly hitting his head on the

23    inside of his cell door."  On March 14, 2023, Decedent "was again observed engaging in self-

24    harming behavior by banging his head on the wall."  Decedent "warned Sheila Membreve, a

25    custody staff member, that he would continue to bang his head on the wall if he was kept in a

26    suicide watch and would rip out the floor in his cell."  *Id.* ¶ 47.  On March 20, 2023, Decedent "was

27    removed from suicide watch and rehoused" and "broke the fire sprinkler in his cell."  *Id.* ¶ 48.  On

28

March 22, 2023, "a subsequent referral was submitted to Correctional Behavioral Health for [Decedent] to receive evaluation and treatment." *Id.* ¶ 49.

On March 23, 2023, Decedent was "evaluated at the pretrial infirmary for suicide watch" and assessed by Defendant Flaminiano, "who confirmed that [Decedent] verbalized suicidal thoughts" and "noted that when she asked [Decedent] if he had a 'plan,' he just shrugged his shoulders." Decedent was transferred back to Lerdo Justice Facility "for suicide watch." *Id.* ¶ 50. On March 23, 2023, Decedent "continued engaging in self-harming behavior" and "custodial staff observed him repeatedly banging his forehead on a glass door," causing it to "bleed and swell, as noted by Nurse Besmanos." *Id.* ¶ 51. On March 28, 2023, Decedent again repeatedly banged "his forehead on the glass door of his cell" and "Nurse Acosta documented [Decedent]'s injuries from the self-harming behavior." Decedent was "placed back in a safety cell following this incident." *Id.* ¶ 52. On April 6, 2023, "custody and medical staff observed injuries on [Decedent]'s head" that were "sustained following [Decedent]'s continuous banging of his head on a window." Decedent "verbalized that he did not want to be on suicide watch" and, Plaintiffs represent on information and belief, "custody and medical staff left [Decedent] to his own devices …" *Id.* ¶ 53.

On April 8, 2023, Decedent "was placed on suicide watch by Defendant Nurse Jei Li-Shapiro due to being aggressive, uncooperative and spitting on a deputy. As a result, [Decedent] was pepper sprayed by custody staff." *Id.* ¶ 54 (capitalization omitted). On April 9, 2023, Decedent "was noted to be agitated and uncooperative," and having "spit on a deputy. Nurse Cagampan documented that [Decedent] was pepper sprayed by custody staff." Decedent "was placed back on suicide watch after refusing his scheduled evening psych medications." *Id.* ¶ 55. On April 11, 2023, Decedent was "observed engaging in self-harming behavior causing bleeding and swelling to his head, as noted by Nurse Besmanos." *Id.* ¶ 56. On April 16, 2023, Decedent was "again assessed for injury after repeatedly banging his forehead on the glass window of his cell, as documented by Nurse Manpreet Pandher." *Id.* ¶ 58. That same day, Decedent "was observed screaming in his cell and exclaiming that he is possessed by a demon. [Decedent] again repeatedly banged his forehead on his cell window, causing bleeding as documented by [Defendant] Flaminiano." After this incident, Decedent "was returned to a safety cell." *Id.* ¶ 59.

On April 19, 2023, Defendant Flaminiano "documented that [Decedent] was making loud noises and cursing at custody staff" and "observed blood on the glass window and wall of [Decedent]'s cell" resulting from Decedent "repeatedly banging his head on the glass window." *Id.* ¶ 60.  On April 22, 2023, Defendant Li-Shapiro "evaluated [Decedent] due to complaints of left shoulder pain after he attempted to climb out of the food slot of his cell." *Id.* ¶ 57.  That same day, Defendant Li-Shapiro "observed [Decedent]'s bizarre behaviors such that she noted he was vulgar, yelling, and crying" and that Decedent "was banging his head intermittently on the window in his cell while completing a suicide risk assessment." *Id.* ¶ 61.  On April 25, 2023, Decedent "refused to take his medication," "threw the cup of water he was provided at his cell door," and stated, "I'm going to hoard my medication and overdose."  Decedent "remained on suicide watch following this incident." *Id.* ¶ 62.

On April 27, 2023, "the court determined that [Decedent] needed to be placed in State Hospital Evaluation Competency due to the custody and medical staff's obvious inability to care for [Decedent]." *Id.* ¶ 63.  On May 1, 2025, Defendant Cuem took Decedent off suicide watch at 2:25 p.m., "in accordance with Defendant" Tiffani Moore, "despite having spent the majority of his time on suicide watch since March 4, 2023 – during which time he continuously exhibited self-harming behavior and suicidal ideation." *Id.* ¶ 64.  Defendant Vivan De La Cruz "completed multiple suicide risk assessments including on March [6, 7, 10, 12, 15, and 16], and April [26 and 27]."  Defendant De La Cruz "documented [Decedent]'s continuous refusals to take his medication and took no further action." *Id.* ¶ 65.  Defendant Flaminiano "completed multiple suicide risk assessments including on March [10 and 14] [and] April [14, 15, 16, 19, and 20] in which she documented [Decedent]'s medication refusals." *Id.* ¶ 66.  Defendant Li-Shapiro "completed multiple suicide risk assessments including on March [11 and 13] [and] April [10, 12, 13, 17, 22, 23, 26, 27, and 28] in which it was documented that [Decedent] continuously refused to take his psychiatric medications." *Id.* ¶ 67.

On May 2, 2023, "in the hours prior to [Decedent]'s death," Defendant Mona De Guzman, a nurse, "attempted to administer [Decedent] his medication which he ultimately refused and no further action was taken." *Id.* ¶ 68.  That same day at 11:36 p.m., Defendant Andrews

"conducted a safety check on [Decedent]'s cell."  "Despite the fact that [Decedent] was not responsive to [Defendant Andrews]' verbal callout," Defendant Andrews "moved along to the other cells.  Approximately 25 minutes later, on May 3, 2023, at 12:01 [a.m.], [Defendant Andrews] approached [Decedent]'s cell and noticed [Decedent] was under the bunk bed in a prone position." Defendant Andrews "instructed [Decedent] to get out from under the bed" and received no response.  Defendant Andrews then "radioed for further assistance."  Defendant Mora arrived and both Mora and Andrews "moved [Decedent] from under the bed to the floor and placed him in a supine position," documenting that Decedent "had the elastic waist band of his boxers around his throat."  After "life-saving measures were attempted, [Decedent] was declared dead at 12:49 [a.m.] on May 3, 2023."  This was 34 hours after being taken off suicide watch.  *Id.* ¶ 69.

The cause of death was determined to be suicide by hanging.  *Id.* ¶ 70.  "Correctional medical records indicated that [Decedent] had a history of suicidal behavior prior to and during his incarceration," with past suicidal behavior "noted during several mental health evaluations" conducted "by correctional medical staff at the [County of Kern] [j]ails from January 2021 through November 2022."  During a prior incarceration at a jail of the County of Kern, on October 19, 2022, Decedent "endorsed suicidal ideation with a plan to disassemble his vape and use [] the pieces to cut his neck."  Decedent was "placed on numerous 5150 holds during that same time period," and had a "well documented … history of psychiatric medications."  *Id.* ¶ 71.

Plaintiffs allege that the KCSO custody and medical staff had access to these prior records when Decedent returned to KCSO custody on March 2, 2023, and any competent staff would have considered this past behavior, the criminal charges "indicative of impulse control," history of mental disorders, and treatment with psychiatric medications to result in "significant elevated risk of suicide in a jail environment warranting a suicide prevention plan with heightened levels of supervision and monitoring and the removal of any suicide hazards from [Decedent]'s housing unit."  *Id.* ¶ 72.

Plaintiffs allege that KCSO custody and medical staff ignored all such signs of elevated suicide risk when deciding on May 1, 2023, to take Decedent off of suicide watch "in a setting with no direct observation capabilities, with no suicide precautions and full access to a litany of items

1    which could be used for self-harm."   Staff "failed to consult with the mental health clinicians

2    regarding [Decedent]'s elevated risk of suicide." *Id.* ¶ 73.  Plaintiffs allege that KCSO staff "failed

3    to implement a suicide prevention plan which put in place monitoring or housing protocols for

4    inmates that were removed from [s]uicide [w]atch status but continued to have an elevated risk of

5    suicide," and competent staff would have placed Decedent in housing with "substantially improved

6    observation capabilities and without suicide hazards, such as items that could be used as ligatures

7    and attachment points." *Id.* ¶ 74.

8          Plaintiffs assert that KCSO staff were "not provided with training or supervision regarding

9    what they should do if an inmate was removed from suicide watch but continued to have an elevated

10   suicide risk," with "no guidelines for additional monitoring or the removal of suicide hazards." *Id.*

11   ¶ 75.  Plaintiffs allege, on information and belief, that Decedent's need for emergency medical

12   intervention went unnoticed by KCSO staff, due to Defendant County of Kern's jails' "patterns and

13   practices of not conducting proper and timely Title 15 welfare and safety checks." *Id.* ¶ 76.

14   **II.    Governing Authority**

15         A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss

16   a plaintiff's complaint for failing "to state a claim upon which relief can be granted."  Fed. R. Civ.

17   P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency.  *N. Star*

18   *Int'l v. Ariz. Corp. Comm'n.*, 720 F.2d 578, 581 (9th Cir. 1983) (citing *Peck v. Hoff*, 660 F.2d 371,

19   374 (8th Cir. 1981)).  A complaint may be dismissed as a matter of law either for lack of a

20   cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.

21   *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (citing *Robertson v. Dean*

22   *Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984)).

23         To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide sufficient

24   factual matter to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662,

25   678 (2009); *see* Fed. R. Civ. P. 8(a)(2) (a complaint must contain a short and plain statement of the

26   claim showing that the pleader is entitled to relief).   A complaint satisfies the plausibility

27   requirement if it contains sufficient facts for the court to "draw [a] reasonable inference that the

28

1  defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

2  (2007).

3        When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court

4  must accept as true all allegations put forth in the complaint and construe all facts and inferences

5  in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted);

6  *Hebbe v. Pliler*, 627 F.3d 338, 340 (9th Cir. 2010).  The complaint need not include "detailed

7  factual allegations," but must include "more than an unadorned, the-defendant-unlawfully-harmed-

8  me accusation." *Iqbal*, 556 U.S. at 678 (citations omitted).  The Court is "not 'required to accept

9  as true allegations that contradict exhibits attached to the Complaint or matters properly subject to

10 judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or

11 unreasonable inferences.'" *Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC*, 733 F.3d

12 1251, 1254 (9th Cir. 2013) (quoting *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir.

13 2010)).

14       "For a [Rule] 12(b)(6) motion, a court generally cannot consider material outside the

15 complaint." *Hamilton v. Bank of Blue Valley*, 746 F. Supp.2d 1160, 1167 (E.D. Cal. 2010) (citing

16 *Van Winkle v. Allstate Ins. Co*., 290 F. Supp.2d 1158, 1162 n.2 (C.D. Cal. 2003)).  "Nonetheless, a

17 court may consider exhibits submitted with the complaint." *Id*.  In addition, a "court may consider

18 evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document;

19 (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of

20 the copy attached to the 12(b)(6) motion." *Id*. at 1168 (quoting *Marder v. Lopez*, 450 F.3d 445,

21 448 (9th Cir. 2006)); accord, *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) ("[D]ocuments

22 whose contents are alleged in a complaint and whose authenticity no party questions, but which are

23 not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to

24 dismiss."), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F. 3d 1119 (9th

25 Cir. 2002).  "A court may treat such a document as 'part of the complaint, and thus may assume

26 that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Hamilton*, 746

27 F. Supp.2d at 1168 (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

28 ///

### III.    **Parties' Contentions**

Hospital Defendants contend that all claims brought against them in the SAC should be dismissed.  *See* (Doc. 65).  They assert that the Plaintiffs failed to comply with the California Government Claims Act regarding claims presentation and administrative exhaustion of state law tort claims.  *Id.* at 8-10.  Separately, Hospital Defendants assert that Plaintiffs fail to plead facts sufficient to state a claim pursuant to 42 U.S.C. §§ 1983 and 12101, 28 U.S.C. § 2201, and 29 U.S.C. § 701.  *Id.* at 10-13.  Lastly, Hospital Defendants argue that Plaintiffs fail to plead sufficient facts to state a claim as to negligence – wrongful death, negligence – medical malpractice, violation of Cal. Gov't Code § 845.6, and Cal. Civ. Code § 52.1 (the "Bane Act").  *Id.* at 13-18.

In opposition to the motion, Plaintiffs contends that they sufficiently complied with the Government Claims Act and, alternatively, equitable estoppel bars Hospital Defendants' argument of noncompliance due to "misleading communication" by the County of Kern.  (Doc. 70 at 13-15). Further, Plaintiffs assert that, pursuant to California law, the delayed discovery rule applies because Plaintiffs did not, and reasonably could not, discover that KCHA was a separate entity from the County of Kern.  *Id.* at 14-16 (citing, *inter alia*, Cal. Gov't Code § 910.8).  Plaintiffs argue that the SAC sufficiently pleads the required elements for the state and federal claims.  *Id.* at 16-21. Plaintiffs request that, if any aspect of Hospital Defendants' motion is granted, they be granted leave to amend.  *Id.* at 21.  Plaintiffs attach to their opposition the declaration of counsel Denisse O. Gastélum (Doc. 70-2), including as exhibits thereto copies of Plaintiffs' claims submitted to the County of Kern prior to initiating litigation (*id.*, Ex. A) and the County of Kern's notices of rejections of the claims (*id.*, Ex. B).

In reply, Hospital Defendants assert that the fact KCHA is a separate legal entity from the County of Kern was readily ascertainable by Plaintiff and, as KCHA never received notice of the claims, Plaintiffs failed to comply with state law.  (Doc. 71 at 2).  Hospital Defendants argue that they met their job duties in providing medical care and assessments to Decedent and Plaintiffs fail to state sufficient facts upon which relief may be granted as to the claims brought pursuant to state law.  *Id.* at 2-4.  Hospital Defendants do not challenge the authenticity of the attached copies of claims and rejections attached to Plaintiffs' opposition.  *See id.* at 2.

IV.   **Discussion**

    A.   **Exhaustion Under California Government Claims Act**

        1.   *Governing Authority*

Under California law, in order to assert a tort claim against a public entity or public employee, a plaintiff must allege compliance with the claims presentation requirements of the California Government Claims Act ("CGCA").  *See* Cal. Gov't Code §§ 945.4, 950.2; *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 627 (9th Cir. 1988); *Fisher v. Pickens*, 225 Cal. App. 3d 708, 718 (1990).  "Compliance with the claims statute is mandatory, and failure to file a claim is fatal to the cause of action."  *Pac. Tel. & Tel. Co. v. Cnty. of Riverside*, 106 Cal. App. 3d 183, 188 (1980).  The plaintiff bears the burden of ensuring that a claim was properly presented to the appropriate public entity.  *Jefferson v. City of Fremont*, No. C-12-0926 EMC, 2013 WL 1747917, at *9 (N.D. Cal. Apr. 23, 2013) (citing *Life v. Cnty. of Los Angeles*, 227 Cal. App. 3d 894, 901 (1991)).

"Before a civil action may be brought against a public entity [or public employee], a claim must first be presented to the public entity and rejected."  *Ocean Servs. Corp. v. Ventura Port Dist.*, 15 Cal. App. 4th 1762, 1775 (1993), *as modified on denial of reh'g* (June 23, 1993); Cal. Gov't Code § 945.4 (generally barring suit "until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board").  Claims for "injury to person or to personal property" must be presented within six months after accrual.  *See* Cal. Gov't Code § 911.2(a); *City of Stockton v. Super. Ct.*, 42 Cal.4th 730, 738 (2007).  A claimant who misses the six-month limitations deadline may file a written application with the public entity for leave to present the late claim within one year of the date of accrual of the cause of action, stating the reason for the delay.  Cal. Gov't Code § 911.4. The claimant has six months after a denial of the application to file a petition in the Superior Court for an order relieving the claimant of section 945.4.  *See* Cal. Gov't Code § 946.6.

        2.   *Analysis*

Here, California state law plainly establishes KCHA as a separate legal entity from the County of Kern.  *See* Cal. Health & Safety Code § 101853 ("Pursuant to this chapter, the board of

1    supervisors may establish by ordinance the Kern County Hospital Authority, which shall be a public

2    agency that is a local unit of government separate and apart from the county and any other public

3    entity for all purposes …").  Plaintiffs do not assert that they presented their claims, pursuant to

4    CGCA, to the KCHA.  Instead, they state that they presented their claims to the County of Kern,

5    and in support thereof, attach to their opposition brief copies of those claims and the subsequent

6    rejection notices.  *See* (Doc. 70-2, Exs. A, B).  The SAC refers to the claims presented to the County

7    of Kern and the Hospital Defendants do not contest the authenticity of the copies attached to

8    Plaintiffs' opposition.  *See* (Doc. 55 ¶ 79; Doc. 71).  Thus, the Court will treat the claims and

9    rejection notices attached as exhibits to Plaintiffs' opposition as part of the complaint and assume

10   their contents to be true for purposes of ruling on Hospital Defendants' motion.  *See Hamilton*, 746

11   F. Supp.2d at 1168.

12        "The claim presentation requirements of the [CGCA] constitute an element of any cause of

13   action that is subject to [the CGCA]."  *Franklin v. City of Kingsburg*, No. 1:18-CV-0824 AWI

14   SKO, 2023 WL 2976285, at *3 (E.D. Cal. Apr. 17, 2023) (citing *California-Am. Water Co. v.

15   Marina Coast Water Dist.*, 86 Cal. App. 5th 1272, 1287 (2022)), *reconsideration denied*, No. 1:18-

16   CV-00824-SKO, 2024 WL 3202424 (E.D. Cal. June 26, 2024); *see DiCampli-Mintz v. Cnty. of

17   Santa Clara*, 55 Cal.4th 983, 990 (2012) ("The filing of a claim is a condition precedent to the

18   maintenance of any cause of action against the public entity and is therefore an *element* that a

19   plaintiff is required to prove in order to prevail.") (citation and quotation omitted; emphasis in

20   original).

21        The California Supreme Court's decision in *DiCampli–Mintz* is instructive.  There, the

22   plaintiff was injured during a surgery performed at a hospital owned by the county.  Plaintiff's

23   counsel sent a letter to the hospital's risk management department, and did not include any request

24   for it to be forwarded to any of the statutorily-designated recipients set forth in the CGCA.  An

25   employee of the risk management department spoke to plaintiff's counsel, acknowledged receipt

26   of the letter, discussed its content, but did not mention the failure to deliver the letter to the

27   appropriate statutory recipient.  The plaintiff argued that she had substantially complied with the

28

1    CGCA by sending the letter, which was received by the risk management department.  *See*

2    *DiCampli-Mintz*, 55 Cal.4th at 987-989.

3         The California Supreme Court rejected this substantial compliance argument, explaining

4    that the plain language of the CGCA required presentation to one of the statutorily-designated

5    recipients or actual receipt by a proper recipient.  *Id.* at 992.  The Court rejected the lower court's

6    holding that the CGCA could be satisfied by a claimant serving a party who has a duty to notify

7    one of the statutorily-designated recipients, holding that "by focusing on the duty of a public

8    employee in receipt of a claim to forward the claim to the proper agency, [the lower court]

9    inappropriately shifts responsibility for filing a claim with the proper official or body from the

10   claimant to the public entity."  *Id.* at 996.

11        The California Supreme Court held that, even if the public entity in question "has actual

12   knowledge of facts that might support a claim, the claims statutes still must be satisfied."  *Id.* at

13   990 (citation omitted).  "Thus, after *DiCampli–Mintz*, either there must be strict compliance with §

14   915(a) or the only way to 'substantially comply' with § 915(a) is if there is actual receipt of the

15   misdirected claim by one of the statutorily designated recipients (*i.e.*, § 915(e))."  *Jefferson*, 2013

16   WL 1747917, at *9.

17        It is clear, and Plaintiffs concede, that they presented a claim to the County of Kern but did

18   not present any claim to the KCHA pursuant to the CGCA.  *See* (Doc. 70).  Plaintiffs advance three

19   arguments in opposing Hospital Defendants' motion regarding failure to comply with the CGCA:

20   1) even if the KCHA is a separate legal entity from the County of Kern, the "close administrative

21   and operational relationship" between them "means that the County's receipt of the claim

22   necessarily conveyed notice to KCHA" (*id.* at 13); 2) equitable estoppel relieves Plaintiffs from the

23   requirements of the CGCA because the County of Kern never issued a notice of non-compliance

24   nor notified Plaintiffs of the claim being "procedurally defective for failure to name the correct

25   public entity or employee" (*id.* at 14-15); and 3) Plaintiffs did not discover, nor reasonably could

26   have discovered, "that KCHA was a separate entity and that a tort claim had to be filed separately

27   against KCHA until KCHA raised this issue" (*id.* at 15-16).

28        First, Plaintiff cites no authority for the proposition that any purported "close administrative

1    and operational relationship" between the County of Kern and the KCHA resulted in notice to the

2    KCHA via notice upon the County of Kern. Indeed, state law establishes the KCHA as a separate

3    legal entity. *See* Cal. Health & Safety Code § 101853. As explained by the California Supreme

4    Court in *DiCampli-Mintz*, there can be no "substantial compliance" upon the KCHA via satisfactory

5    service of a claim upon the County of Kern; the statutory requirements of the CGCA must still be

6    satisfied and that requires satisfactory delivery of a claim to the statutorily-designated recipients at

7    the KCHA. *DiCampli-Mintz*, 55 Cal.4th at 990. Further, as state law expressly establishes the

8    KCHA as a separate legal entity from the County of Kern, Plaintiffs' argument that they could not

9    reasonably discover that fact is unavailing given its existence is set forth set forth in the California

10   Health and Safety Code, section 101853.

11          Second, the holding in *DiCampli-Mintz* materially limits the availability of equitable

12   estoppel under the circumstances here and Plaintiffs' citations to California state authority in

13   support of their equitable estoppel argument are not persuasive. If "a claim as presented fails to

14   comply substantially with the Act's requirements, Cal. Gov. Code § 910.8, it triggers various

15   requirements." *Soublet v. Cnty. of Alameda*, No. 18-CV-03738-JST, 2018 WL 6268872, at *3

16   (N.D. Cal. Nov. 29, 2018) (quotations omitted) (citing *Phillips v. Desert Hosp. Dist.*, 49 Cal.3d

17   699, 707 (1989)). "Where a document qualifies as 'a claim as presented,' the public entity must

18   give the claimant notice of the defect, *see* Cal. Gov. Code § 910.8, or else waive that defense, *see*

19   *id.* § 911." *Id.* The aforementioned California state statutes, therefore, do not establish that the

20   County of Kern was required to notify Plaintiffs of a defect or noncompliance regarding their failure

21   to *properly deliver a claim to the KCHA*, only that the County must have given notice of a defect

22   if Plaintiffs' *claim, as properly presented to the County, failed to substantially comply* with

23   applicable requirements. *See Jefferson*, 2013 WL 1747917, at *9 ("The problem here is that

24   *DiCampli–Mintz* puts limitations on any estoppel argument … in *DiCampli–Mintz*, an employee

25   from the County's risk management department responded to the letter from the plaintiff's attorney,

26   engaged in a substantive discussion with the attorney, but never said anything about the claim being

27   presented to the wrong party. In spite of these facts, the California Supreme Court still held in the

28   County's favor.").

Additionally, the Board of Supervisors of the County of Kern and the Board of Governors of the KCHA are separate entities with different members[2] and, thus, any argument of substantial compliance based on any such facts is unavailing. *See DiCampli-Mintz*, 55 Cal. 4th at 997 ("These cases hold that when the governing body of one public entity is also the governing body of another public entity, a claim against the subordinate entity that is delivered to the governing body constitutes substantial compliance with the claims statute. That is not the case here.").

Plaintiffs do not cite to any authority for the proposition that the substantial compliance doctrine applies differently in the instant action than as set forth by the California Supreme Court in *DiCampli-Mintz*. Plaintiffs concede that they did not deliver their claim to KCHA as required by California state law. *See* (Doc. 70 at 13-15). As such, Plaintiffs fail to plead a necessary element of their claims brought pursuant to state law. Thus, the Court will grant Hospital Defendants' motion as to the sixth, seventh, eighth, and ninth causes of action in the SAC. *See Frazier v. City of Fresno*, No. 1:20-CV-01069-ADA-SAB, 2023 WL 4108322, at *37 (E.D. Cal. June 21, 2023) (collecting cases and noting CGCA applies to Cal. Civ. Code § 52.1, insofar as the claim seeks damages); *see also Hicks v. Hamkar*, No. 2:13-CV-01687-KJM-DB, 2016 WL 5847011, at *8 (E.D. Cal. Oct. 6, 2016) ("To file a claim under section 845.6, a plaintiff must first exhaust the administrative remedies established in the Government Claims Act."), *report and recommendation adopted*, No. 13-CV-01687-KJM-DB, 2017 WL 3105643 (E.D. Cal. July 21, 2017), *clarified on denial of reconsideration*, No. 2:13-CV-01687-KJM-DB PS, 2017 WL 3537254 (E.D. Cal. Aug. 17, 2017).

As the sixth, seventh, eighth, and ninth causes of action against the Hospital Defendants will be dismissed, the Court will not reach Hospital Defendants' alternative arguments for dismissal of said claims on the grounds that they are inadequately pleaded. *See Martinez v. Cnty. of Riverside*, No. EDCV 22-2144 JGB (SHKx), 2023 WL 4680791, at *3 (C.D. Cal. June 8, 2023) ("Because failure to allege compliance with the California Government Claims Act is fatal, the Court

---

[2] *Compare* Kern County Board of Supervisors, https://www.kerncounty.com/government/board-of-supervisors (last visited September 10, 2025), *with* Kern County Hospital Authority Board of Governors, https://www.kernmedical.com/about-us/hospital-authority/board-of-governors/ (last visited September 10, 2025).

1    DISMISSES Plaintiffs' state law claims for failure to comply with California procedures …

2    Furthermore, because the Court dismisses Plaintiffs' state law claims, the Court need not reach the

3    County's other contentions against those claims.") (citation and quotation omitted).[3]

4         **B.**     **Federal Claims Against Individual Defendants**

5             1.     *Governing Authority*

6    To state a claim under section 1983, a plaintiff is required to show that (1) each defendant

7    acted under color of state law and (2) each defendant deprived him of rights secured by the

8    Constitution or federal law. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021)

9    (citing *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *West v. Atkins*, 487 U.S.

10   42, 48 (1988)).    This requires the plaintiff to demonstrate that each defendant personally

11   participated in the deprivation of his rights. *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th

12   Cir. 2009); *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007).

13   The Fourteenth Amendment protects the rights of pretrial detainees. *Bell v. Wolfish*, 441

14   U.S. 520, 545 (1979); *see Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (noting

15   that pretrial detainees' "rights arise under the Fourteenth Amendment's Due Process Clause").

16   Relevant here, the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim

17   against an individual defendant are:

18          (1) The defendant made an intentional decision with respect to the
     conditions under which the plaintiff was confined; (2) those
19          conditions put the plaintiff at substantial risk of suffering serious
     harm; (3) the defendant did not take reasonable available measures
20          to abate that risk, even though a reasonable officer in the
     circumstances would have appreciated the high degree of risk
21          involved—making the consequences of the defendant's conduct
     obvious; and (4) by not taking such measures, the defendant caused
22          the plaintiff's injuries. With respect to the third element, the
     defendant's conduct must be objectively unreasonable, a test that will
23          necessarily turn[] on the facts and circumstances of each particular
     case.
24

25          [3] While the Court acknowledges and does not take lightly the significant implications here for
     Plaintiffs' failure to properly comply with the claims presentation requirements under the CGCA, for the
26   reasons set forth above, Plaintiffs' arguments that dismissing their state law claims "would subvert the very
     policy underlying the [CGCA]" (Doc. 70 at 13) are without merit and contrary to *DiCampli-Mintz*. *See*
27   *Hawkins v. City of Barstow*, No. EDCV 20-557-MWF-SP, 2020 WL 6036322, at *3 (C.D. Cal. Sept. 15,
     2020) ("This result [dismissal of claims] is undoubtedly harsh, but the Court's hands are tied by the
28   California Supreme Court's unforgiving construction of the Act's presentment requirement.").

1  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (alteration in original; footnote,

2  citation, and internal quotation marks omitted); *see Gordon v. Cnty. of Orange*, 888 F.3d 1118,

3  1125 (9th Cir. 2018).

4          The Supreme Court has explained that there is "no significant distinction between claims

5  alleging inadequate medical care and those alleging inadequate 'conditions of confinement.'

6  Indeed, the medical care a prisoner receives is just as much a 'condition' of his confinement as ...

7  the protection he is afforded against other inmates." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991);

8  *see also Gordon*, 888 F.3d at 1124 ("we have long analyzed claims that government officials failed

9  to address pretrial detainees' medical needs using the same standard as cases alleging that officials

10  failed to protect pretrial detainees in some other way").

11          Thus, to bring a pretrial detainee's failure to protect or inadequate medical care claim under

12  the Fourteenth Amendment, a plaintiff must establish the same four factors as noted above.

13  *Gordon*, 888 F.3d at 1125; *Castro*, 833 F.3d at 1071.  In contrast to the knowing and purposeful

14  state of mind in the first element, the remaining elements require an objective standard.  *See Castro*,

15  833 F.3d at 1070-71.  As noted *supra*, the third element must be viewed on each case's particular

16  facts and circumstances, and the plaintiff must prove the defendant acted with "more than

17  negligence but less than subjective intent – something akin to reckless disregard." *Sandoval*, 985

18  F.3d at 669 (quoting *Castro*, 833 F.3d at 1071).

19          The Fourteenth Amendment also protects liberty interests in the companionship between

20  parents and children.  "Parents and children may assert Fourteenth Amendment substantive due

21  process claims if they are deprived of their liberty interest in the companionship and society of their

22  child or parent through official conduct." *Lemire v. Cal. Dep't. of Corr. & Rehab.*, 726 F.3d 1062,

23  1075 (9th Cir. 2013).  "Only official conduct that shocks the conscience is cognizable as a due

24  process violation … A prison official's deliberately indifferent conduct will generally 'shock the

25  conscience' so as long as the prison official had time to deliberate before acting or failing to act in

26  a deliberately indifferent manner." *Id.* (citations and quotations omitted).

27  ///

28  ///

1          2.      *Analysis*

2          Pursuant to section 1983, Plaintiffs assert as their first, second, and third causes of action

3   violations of the Fourteenth Amendment for failure to protect from harm, failure to provide medical

4   care, and deprivation of the right to a familial relationship with decedent, respectively.  (Doc. 55 at

5   32-43).  Here, because Decedent was a pretrial detainee, his rights derive from the due process

6   clause of the Fourteenth Amendment.  *See Bell*, 441 U.S. at 545.  "The duty to protect detainees

7   from suicide is grounded in the substantive liberty interest to adequate medical care."  *Atayde v.*

8   *Napa State Hosp.*, 255 F. Supp. 3d 978, 988 (E.D. Cal. 2017).

9          Hospital Defendants argue that Plaintiffs failed to plead sufficient facts regarding what

10  actions or inactions by Hospital Defendants support the assertions of deliberate indifference to

11  Decedent's medical needs.  (Doc. 65 at 10).  Hospital Defendants represent that KCHA nursing

12  staff perform initial intake assessments, distribute medications prescribed by physicians, perform

13  daily suicide assessments, treat minor medical conditions, refer inmates to the hospital or County

14  Behavioral Health, and recommend inmates to be placed on suicide watch.  Hospital Defendants

15  further assert that the nursing staff assessed Decedent on a continual basis and made numerous

16  referrals to County Behavioral Health for treatment, and placed Decedent on suicide watch or a

17  safety cell for the majority of his time at the Lerdo Pre-Trial Facility.  Hospital Defendants also

18  assert that it is not the job of nursing staff "to provide mental health care or medical treatment

19  required by a trained medical doctor."  *Id.* at 12.  Hospital Defendants argue that "KCHA nursing

20  staff did their job" and "[n]owhere in the SAC does it allege that the KCHA nursing staff failed to

21  provide medical care to [Decedent]."  *Id.* at 13.

22         Plaintiffs argue that "superficial or perfunctory assessments are not a defense to deliberate

23  indifference."  (Doc. 70 at 17; emphasis omitted) (citing *Colwell v. Bannister*, 763 F.3d 1060,

24  1068–1069 (9th Cir. 2014)).  Plaintiffs note that the SAC asserts that Hospital Defendants

25  "continually cycled [Decedent] through inadequate and ineffective interventions, including placing

26  him on suicide watch only to remove him prematurely."  Plaintiffs contend that deliberate

27  indifference "does not turn on whether staff had the final authority to provide mental health

28  treatment," but rather, "whether they knew of a substantial risk of serious harm and failed to take

1    reasonable steps to mitigate it." *Id.* (emphasis omitted).  Plaintiffs assert that they have sufficiently

2    pled Hospital Defendants, charged with his care, "observed clear signs of [Decedent]'s mental

3    deterioration and instead of taking any meaningful action," allowed Decedent "to languish,

4    untreated in custody until his death on May 3, 2023." *Id.* (emphasis omitted).

5        As a preliminary matter, in addition to section 1983, Hospital Defendants mention in their

6    motion 42 U.S.C. § 12101, 28 U.S.C. § 2201, and 29 U.S.C. § 701 (presumably, the ADA and

7    Rehabilitation Act causes of action set forth in Plaintiffs' 11th and 12th causes of action).  (Doc.

8    65 at 10).  However, Hospital Defendants advance no arguments in support of dismissal of these

9    claims and, further, the SAC does not purport to include Hospital Defendants in these two causes

10   of action.  Thus, the Court will not address such claims.

11       Here, Plaintiffs allege in the SAC that individual Hospital Defendants were aware of

12   Decedent's serious medical needs, including through observation of Decedent's harmful and erratic

13   behaviors, and though they took some actions responsive to Decedent's serious medical needs,

14   those actions were inadequate and coupled with identified inaction.  For instance, Plaintiffs allege

15   that, on one occasion, while Decedent was engaged in self-harming conduct, he asserted he did not

16   want to be placed on suicide watch and custody and medical stuff "left him to his own devices."

17   (Doc. 55 ¶ 53).  The SAC also alleges Decedent repeatedly refused administration of his

18   psychotropic medications – approximately 24 times over a seven-week period – and custody and

19   medical staff failed to act.  *Id*. ¶¶ 55, 65-68.  Plaintiffs also connect each individual Hospital

20   Defendant to interactions with Decedent.  *Id.* ¶¶ 50, 54, 61, 66, 67, 68.

21       Contrary to Hospital Defendants' contentions, individuals need not be physicians nor tasked

22   with providing mental healthcare to be subject to the Fourteenth Amendment in regards to

23   deliberate indifference towards pretrial detainees.  *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d

24   1232, 1242 (9th Cir. 2010) (explaining that the "'deliberate indifference' standard applies to claims

25   that correction facility officials failed to address the medical needs of pretrial detainees"), *overruled*

26   *on other grounds by Castro*, 833 F.3d at 1060; *see also Est. of Prasad ex rel. Prasad v. Cnty. of*

27   *Sutter*, 958 F.Supp.2d 1101, 1112 (E.D. Cal. 2013) (noting deliberate indifference violates

28

1    Fourteenth Amendment rights of pretrial detainees "whether the indifference is manifested by

2    doctors, guards, or other personnel").

3        Plaintiffs plead in the SAC that Defendant Flaminiano assessed Decedent on March 23,

4    2023, confirmed that he verbalized suicidal thoughts, and asked whether he had a "plan," in

5    response to which Decedent shrugged his shoulders.  Decedent was then transferred back to Lerdo

6    Justice Facility on suicide watch.  (Doc. 55 ¶ 50).  Defendant Li-Shapiro is alleged to have placed

7    Decedent on suicide watch, due to Decedent being aggressive.  Defendant Li-Shapiro is also alleged

8    to have observed Decedent's "bizarre behaviors," banging his head intermittently on the window

9    in his cell while completing a suicide risk assessment (*id.*  ¶ 61), and to have completed multiple

10   suicide risk assessments documenting Decedent's continuous refusal to take his psychiatric

11   medications (*id.* ¶ 67).  Defendant De La Cruz is asserted to have completed multiple suicide risk

12   assessments, documented Decedent's "continuous refusals" to take his medication, and to have

13   taken no further action.  *Id.* ¶ 66.  Defendant De Guzman is asserted to have attempted to administer

14   Decedent his medication, which he refused to take, and to have taken no further action.  *Id.* ¶ 68.

15       Further, taken in the light most favorable to Plaintiffs, Hospital Defendants allegedly had

16   access to Decedent's prior records, containing facts concerning his past behavior, criminal charges

17   "indicative of impulse control," history of mental disorders, and treatment with psychiatric

18   medications, and such facts indicated "significant elevated risk of suicide in a jail environment

19   warranting a suicide prevention plan with heightened levels of supervision and monitoring and the

20   removal of any suicide hazards from [Decedent]'s housing unit." *Id.* ¶¶ 41, 45, 72.  Plaintiffs allege

21   that Hospital Defendants ignored all such signs of elevated suicide risk when deciding on May 1,

22   2023, to take Decedent off of suicide watch "in a setting with no direct observation capabilities,

23   with no suicide precautions and full access to a litany of items which could be used for self-harm."

24   *Id.* ¶ 73.  Plaintiffs also allege that Hospital Defendants failed to take reasonable measures to abate

25   or reduce the risks of Decedent suffering serious harm.  *Id.* at 33-34.

26       The decision of another judge of this Court in the case of *Deloney v. County of Fresno*[4] is

27   instructive.  In *Deloney*, defendant medical and nursing care providers filed a motion to dismiss

28   ───────────────
     [4] No. 1:17-CV-01336-LJO-EPG, 2019 WL 1875588, at *7 (E.D. Cal. Apr. 26, 2019).

plaintiff's complaint bringing claims pursuant to section 1983 for the death by suicide of her son in pretrial custody.  Plaintiff asserted in her complaint that defendants knew of decedent's heightened suicide risk and decedent had been suicidal on multiple occasions.  Defendants transferred decedent numerous times between segregation lockdown housing and a safety cell, but did not send him to a mental health facility or employ any other abatement techniques.  After a suicide attempt using a bedsheet, defendants recommended decedent be transferred to an isolation cell and restricted to the use of safety cell garments and blankets, but took no other steps.  *Id.* at *1-2.

After a mental health evaluation, defendants recommended decedent be transferred back to lockdown housing, lifted his safety restrictions, and reduced his visual monitoring to once per hour.  Decedent attempted suicide a few days later.  Defendants did not subsequently evaluate decedent or attempt to intervene, and no housing adjustments or other precautions were taken.  A few days after the suicide attempt, and while off of suicide watch, decedent hanged himself in his cell.  *Id.* In denying the motion, the court noted that "the SAC's additional allegations appear to put forth the following theory of liability – because these [medical care] [d]efendants did not take any further steps besides the safety housing transfer, such as sending Mayberry to a mental health facility, evaluating Mayberry for medication needs, or providing Mayberry with psycho-education materials for coping strategies, they were deliberately indifferent to Mayberry's serious medical needs since they were aware of or should have been aware of his suicidal ideations and should have done more to address the risk or followed up after the housing transfer."  *Id.* at *7.

The court found that the SAC sufficiently alleged a plausible claim under the Fourteenth Amendment pursuant to section 1983 "for not taking any additional steps besides placing him in safety housing after allegedly knowing Mayberry had reported hearing voices in his head to kill himself … While it is not clear whether a safety housing transfer was sufficient to address Mayberry's serious medical needs, [p]laintiff has alleged enough for a plausible deliberate indifference claim.  'At this stage in the pleadings, the Court will not engage in an extensive analysis of the adequacy of the mental health system in place at the jail … [T]he Court may infer from the allegations of the FAC that after it was noted in [d]ecedent's file that he was suicidal, [d]efendant[s]

1    may bear some responsibility for the failure to provide care which led to [d]ecedents' death.'" *Id.*

2    (quoting *Est. of Jessie P. Contreras v. Cnty. of Glenn*, No. 2:09-CV-2468-JAM-EFB, 2010 WL

3    4983419, at *4 (E.D. Cal. Dec. 2, 2010)).

4         Here, in the SAC, Plaintiff asserts that individual Hospital Defendants were aware of

5    Decedent's heightened risk of self-harm, both from access to prior records and from direct

6    observation and experience, Decedent was put at serious risk therefrom, and Defendants did not

7    take reasonable measures to abate said risk, resulting in Decedent's suicide.  In short, Plaintiffs

8    allege a two-month period of Decedent's continuous, unabated, and extensive manifestation of

9    suicidal behavior while in the custody and care and under the observation of Defendants (including

10   Hospital Defendants).  At the pleading stage, and making all reasonable inferences in favor of

11   Plaintiffs, the Court concludes Plaintiffs have adequately alleged that individual Hospital

12   Defendants were aware the Decedent was in substantial danger of killing himself and at an acute

13   risk of harm.  Further, while Hospital Defendants took certain actions responsive to Decedent's

14   condition, it is alleged that they failed to take other reasonable measures and that the sum total of

15   their conduct (and inaction) amounts to deliberate indifference.  Plaintiffs have, thus, sufficiently

16   pled failure to protect from harm and failure to provide medical care under the Fourteenth

17   Amendment, pursuant to section 1983.  *See id.* at *8 ("Plaintiff has alleged that these Defendants

18   were aware of Mayberry's high risk of suicide … that indicated steps needed to be taken to reduce

19   his suicidal ideations and further alleged that Mayberry had told [medical] staff that he was hearing

20   voices telling him to kill himself.  While the safety housing transfers were a step to abate the risk

21   of suicide, more may have been reasonably necessary to abate the risk.  A complete failure to treat

22   the prisoner is not a prerequisite.").

23        Hospital Defendants maintain in general that the actions they are alleged to have taken in

24   response to Decedent's behavior are sufficiently reasonable to avoid section 1983 liability given

25   that they are not mental health care providers, are not charged with monitoring and providing

26   mental health care, and performed their assigned duties reasonably.  (Doc. 65 at 10-13).  But the

27   individual Hospital Defendants' purported limited roles and responsibilities as proffered in their

28   motion to dismiss are not properly before the Court at this stage.  Whether Defendants' actions

1  were "objectively unreasonable" necessarily is a fact-intensive inquiry (*Castro*, 833 F.3d at 1071)

2  that is not suitable for resolution on a motion to dismiss given the facts alleged in the SAC.

3          Regarding Plaintiffs' claim of deprivation of right to a familial relationship, as noted *supra*,

4  "[a] prison official's deliberately indifferent conduct will generally 'shock the conscience' so as

5  long as the prison official had time to deliberate before acting or failing to act in a deliberately

6  indifferent manner." *Lemire*, 726 F.3d at 1075.  Hospital Defendants advance no other arguments,

7  aside from those recounted above, for dismissal of this claim.  As the Court has found Plaintiffs

8  sufficiently state a claim regarding individual Hospital Defendants' failure to protect and to provide

9  medical care, and the facts as pled in the SAC plausibly demonstrate that Hospital Defendants could

10  have had time to actually deliberate, Plaintiffs assertions are sufficient to survive a motion to

11  dismiss.  *See Palacios v. Cnty. of San Diego*, No. 20-CV-450-MMA (DEB), 2020 WL 4201686, at

12  *11 (S.D. Cal. July 22, 2020) ("… the Court has already found that Plaintiff pleads sufficient facts

13  to show a deliberate indifference to Ortiz's serious medical needs under the Fourteenth Amendment

14  … These facts leading up to Ortiz's suicide plausibly demonstrate that [personnel] could have had

15  time to actually deliberate.  Therefore, the Court finds that Plaintiff pleads sufficient facts to sustain

16  her substantive due process claim under the Fourteenth Amendment for the purpose of surviving a

17  motion to dismiss."); *see also Est. of Prasad*, 958 F. Supp. at 1116 ("A prison official's deliberate

18  indifference to a prisoner's serious medical needs shocks the conscience and states a claim under

19  the substantive due process clause.  Here, since Plaintiffs allege deliberate indifference by the Sutter

20  Defendants, and since the Sutter Defendants advance no other arguments for dismissal, Plaintiffs

21  have stated a substantive due process claim against the Sutter Defendants.").

22          Lastly, Hospital Defendants offer only conclusory arguments that Plaintiffs have not stated

23  sufficient facts to state a claim against KCHA itself as employer of the individual Hospital

24  Defendants.  (Doc. 65 at 10, 13).  Aside from these perfunctory assertions, however, Hospital

25  Defendants advance no particular arguments concerning the claims against KCHA in the SAC.  As

26  the motion does not advance any arguments relating to *Monell* claims against KCHA, the Court

27  will not address said claims, as asserted in the fourth cause of action.

28

1    Thus, the Court will deny the Hospital Defendants' motion as to the first, second, third, and

2    fourth causes of action in the SAC.

3    **C.      Leave to Amend**

4    Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "should be

5    freely granted when justice so requires" as the purpose of the Rule is "to facilitate decision on the

6    merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th

7    Cir. 2000). However, courts may, in their discretion, choose to decline leave to amend due to

8    futility, bad faith, undue delay, prejudice to the opposing parties, dilatory motive or conduct, or a

9    repeated failure to cure deficiencies by amendments. *See Carvalho v. Equifax Info. Servs., LLC*,

10   629 F.3d 876, 892–893 (9th Cir. 2010). A court's discretion in denying leave to amend is

11   particularly broad after plaintiff has already been afforded an opportunity to amend the complaint.

12   *See Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016).

13   Here, Plaintiffs request leave to amend any claim dismissed. (Doc. 70 at 21). Although it

14   is unlikely Plaintiffs could remedy the CGCA deficiencies noted above, given that leave to amend

15   is to be liberally granted, the Court will permit Plaintiffs to amend the sixth, seventh, eighth, and

16   ninth causes of action only to the extent they are able in good faith to cure the defects noted above.

17   **V.    Conclusion and Order**

18   Based on the foregoing, IT IS HEREBY ORDERED that:

19   1.  Hospital Defendants' motion to dismiss (Doc. 65) is GRANTED in part:

20       a.  The motion is GRANTED, with leave to amend, as to the sixth, seventh, eighth,

21          and ninth causes of action against Hospital Defendants;

22       b.  The motion is DENIED as to the first, second, third, fourth, and tenth causes of

23          action; and

24

25          *Remainder of This Page Intentionally Left Blank*

26

27

28

2. Hospital Defendants are granted leave to amend and shall file any third amended complaint within 14 days of entry of this order.

IT IS SO ORDERED.

Dated:   **September 18, 2025**

UNITED STATES MAGISTRATE JUDGE